FILED
2010 Jun-15  PM 02:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**DAVID S. BRADFORD,**

     **Plaintiff,**

**v.**                         **Civil Action No.: 2:09-cv-750-IPJ**

**CITY OF BIRMINGHAM, et al.,**

     **Defendant.**

## <u>MEMORANDUM OPINION</u>

Plaintiff David S. Bradford alleges violations of 42 U.S.C. § 1981 and ALA. Code § 25-1-10 and conspiracy to violate ALA. Code § 25-1-10 by defendants City of Birmingham ("City") and Personnel Board of Jefferson County ("Board"). Defendants City and Board filed motions for summary judgment, evidentiary materials, and briefs in support (docs. 29-32).  The plaintiff filed a response to each and evidentiary materials (docs. 39-42).  Defendant City filed a reply brief (doc. 54) and defendant Board filed a reply brief and supplemental brief (docs. 55, 59).  Also pending before the court are defendant City and Board's motions to strike (docs. 53, 56) and plaintiff's responses to said motions to strike (docs. 60-61).

## <u>Factual Background</u>

David S. Bradford[1] claims the City and Board violated ALA. Code § 25-1-10 by not including Native Americans as a minority in affirmative action programs that the City and Board purportedly have.  He also claims violations 42 U.S.C. § 1981 on the basis that he was not selected for the position for which he applied because of  racial discrimination.

The Selection Process

Bradford has been employed with Birmingham Fire and Rescue Service as a firefighter since 2000.  Bradford Dep., at 11, 14.  In September 2006 Bradford applied for a position as Fire Prevention Inspector I[2] with the City through the Board's online application process.  Bradford Dep., at 32-33; Compl. ¶ 15.  He took and passed an exam administered by the Board, and his name was placed on a certified list[3] of eligible candidates for the position by December 11, 2006.

---

[1]When Bradford was nineteen years old, he had his name legally changed from Samuel Thomas Piazza to David Sam Bradford because he "wanted a name that was easy to spell, easy to pronounce."  Bradford Dep., at 10-11.

[2]Bradford had previously taken examinations to qualify for positions as dispatcher and fire lieutenant.  He was offered employment as a dispatcher with the City of Homewood but declined because the offered salary was lower than his income as a firefighter.  The exam scores for the fire lieutenant position were thrown out after he was caught cheating on the examination and he was suspended.  Bradford Dep., at 29-31, 250-251.

[3]The list contained thirty-five applicants.  Certified List of Applicants, Ex. 3 to the Board's Motion for Summary Judgment.

Bradford Dep., at 48-49; Letter from the Board to Bradford, Ex. 3 to the Board's

Motion for Summary Judgment (doc. 32-3). Bradford's score was a 95.47 and he

was ranked seventh.[4]   Bradford Dep., at 50.

On February 13, 2007, Senior Fire Inspectors Christopher Brooks, Andrew

Lorren Oliver, the director of the Board since December of 2005, testified

by affidavit that "no race and/or gender conscious selection procedures or

screening and certification procedures" were used since he began working at the

Board in 2002.  Oliver Aff. ¶¶ 3, 11 (doc. 32-4).  He maintains that the applicants'

rankings were not based on race or gender in any way.  Oliver Aff. ¶ 13.  Bradford

has no documented evidence that the Board developed questions for its

examinations that were intended to be discriminatory.  Bradford Dep., at 103.

Bradford has no evidence that examination scores were altered according to each

applicant's race and has no evidence that his score of 95.47 is not accurate.

Bradford Dep., at 207, 209.

On February 13, 2007, Senior Fire Inspectors Christopher Brooks, Andrew

---

[4]A letter notifying Bradford of his score and rank stated: "NOTE: The rank presented below is a **preliminary** rank that is subject to change pending the submission and resolution of any written appeals."  The letter notes that appeals must be submitted to the Director of the Board by written letter that "describ[es] in detail why your score should be re-evaluated.  Appeals received after this date will **not** be considered."  Letter from the Board to Bradford, Ex. 3 to Board's Evidentiary Submission, (doc. 32) (emphasis in original).  The plaintiff has presented no evidence that he pursued an appeal.

Cunningham, and Mary Bowden interviewed Bradford, one of thirteen individuals

interviewed, for the position.  Interview Process for Fire Inspectors, Ex. M to the

City's Motion for Summary Judgment (doc. 29-14).  Each applicant was evaluated

based on seven criteria[5] and was given a designation as exceeding job

requirements, meeting job requirements, or not meeting job requirements in each

of the seven categories.  Applicant Rating Factor Source Sheet, Ex. N to the City's

Motion for Summary Judgment (doc. 29-15); Ratings Chart of the Candidates, Ex.

O to the City's Motion for Summary Judgment (doc. 29-16).

    Nikara Washington received five ratings of "exceeds job requirements" and

two ratings of "meet job requirements."  Bradford, on the other hand, received

two "exceeds job requirements," three "meets job requirements," and two "does

not meet job requirements."  Washington received the most "exceeds job

---

[5]The seven criteria were: (1) education and training; (2) experience and skills in applying codes, standards, rules and regulations in real-life situations; (3) ability to achieve compliance with laws, ordinances, and regulations; (4) ability to interact effectively with the public and how to handle difficult situations; (5) experience in teaching and conducting training classes; (6) ability to express oneself and communicate why they should be considered for the position; (7) ability to work flexible hours to cover related assignments.  Ratings Chart of the Candidates, Ex. R to the City's Motion for Summary Judgment (doc. 29-16).  The applicant's application, resume, and interview were all consulted in evaluating his or her education and training; the remaining factors were evaluated based solely on the applicant's interview.  Applicant Rating Factor Source Sheet, Ex. N to the City's Motion for Summary Judgment (doc. 29-15).

requirements" ratings of all the interviewees, and both Brooks and Cunningham believed Washington performed better during the interview and was a better communicator than Bradford. Ratings Chart of the Candidates with Names, Ex. R to the City's Motion for Summary Judgment (doc. 29-19); Brooks Aff. ¶ 6, Ex. P to the City's Motion for Summary Judgment (doc 29-17); Cunningham Aff. ¶ 6, Ex. Q to the City's Motion for Summary Judgment (doc 29-18). Performance during the interview was the most important factor in scoring the candidates for the position, Brooks Aff. ¶ 5; Cunningham Aff. ¶ 5, and because the position was entry-level, no experience in fire prevention, safety, inspection, or suppression was required. Cunningham Dep., at 19. In fact, four-year degrees and certificates as an "Inspector I" warranted the same rating in the "education and training" category. Cunningham Dep., at 19. Washington had completed course work toward a master's degree in public administration, while Bradford had seven years of firefighting experience. Interview Candidate Bio Forms, Exs. 2 & 11 to Plaintiff's Evidentiary Materials to the City's Motion for Summary Judgment (doc. 40-11).

The interview committee made the recommendation to Acting Chief Carl Harper that "candidate 2" be offered the position. Interoffice Memo to Harper, Ex. S to City's Motion for Summary Judgment (doc. 29-20); Brooks Dep., at 27, Ex. C

to City's Motion for Summary Judgment (doc. 29-4).  Brooks sent Chief Harper a

letter that stated:

> After due consideration, the panel reached the conclusion that
> candidates 2 and 5 were the most qualified applicants for the position.
> After the interview process, candidate 2 led in one category more than
> candidate 5.  Candidate 2 has more education [than] candidate 5.
> Therefore, the committee recommends that candidate 2 be offered the
> position of Fire Inspector I.

Interoffice Memo to Harper, Ex. 5 to City's Motion for Summary Judgment (doc.

29-20).[6]  Candidate 2 was Nikara Washington.  Harper Decl. ¶ 7, Ex. T to City's

Motion for Summary Judgment (doc 29-21).

Bradford has no evidence that the interview committee or Chief Harper

were aware of the plaintiff's alleged Native American ancestry, and both Brooks

and Cunningham testified that they had no knowledge of such ancestry when they

made their recommendation.  Bradford Dep., at 215; Brooks Aff., ¶ 8;

Cunningham Aff., ¶ 8.  Both Brooks and Cunningham maintain that the interview

committee did not consider race in making their recommendation.  Brooks Dep., at

42, 52; Cunningham Dep., at 26.  Chief Harper did not have any information about

the race or sex of "candidate 2" when he selected her for the position, nor did he

---

[6]Candidate five was Antwan Kelser, who received four "exceed job
requirements" and three "meets job requirements" ratings.  Kelser's highest level
of education was a high school diploma.  Applicant Rating Form, Ex. 3 to
Plaintiff's Response (doc. 40-3).

know Bradford's race.  Harper Decl. ¶¶ 6, 9.

Defendants' Purported Affirmative Action Programs

In asserting that the Board had an affirmative action policy, the plaintiff

refers to Section 2 of the Enabling Act of the Personnel Board of Jefferson

County, which states:

> The Board is especially charged with the responsibility and
> empowered to place special emphasis on making provisions for
> inclusion in the merit system of physically and mentally handicapped
> persons and to make special regulations and to grant exceptions from
> the provisions of this Act and its regulations promulgated hereunder
> as it shall from time to time deem appropriate to carry out this
> provision.

1977 Ala. Acts 677, as amended.  The Board maintains that it has no affirmative

action plan.  Oliver Aff., ¶ 12.

A document, labeled "AFFIRMATIVE ACTION PLAN, BIRMINGHAM

FIRE AND RESCUE SERVICE DEPARTMENT," states that the Birmingham

Fire and Rescue Service Department ("Fire Department") shall ensure "that equal

employment opportunities with the Birmingham Fire and Rescue Service

Department  are available to all persons, regardless of race or sex, as required by

Title VII of the Civil Rights Act of 1964, as amended."  Ex. L to the City's Motion

for Summary Judgment, at 1 (doc. 29-13).  The plan has a long term goal of

"ensur[ing] that any and all unlawful barrier to employment . . . that have existed

for blacks and women are removed[ and] that any present effects of past employment discrimination are fully remedied."  It continues, "In order to achieve the long term goal, the Birmingham Fire and Rescue Service Department will implement lawful, non-discriminatory selection procedures."  Ex. L to the City's Motion for Summary Judgment, at 1.

Bradford claims that he is a Native American, but he identified his race as "W" on a form entitled "BIRMINGHAM FIRE AND RESCUE SERVICE DEPARTMENT PERSONNEL DATA FORM," which he signed in 2000.  Ex. F to the City's Motion for Summary Judgment (doc. 29-7).  Further, Bradford's birth certificate designates both his mother and father as "white."  Ex. E to the City's Motion for Summary Judgment (doc. 29-6).

Bradford  had no documentation to support his claim that he is a Native American until he became a member of a Cherokee tribe on May 17, 2010, two days before plaintiff's responses to the defendants' motions for summary judgment were due.  Plaintiff's Response to City's Motion for Summary Judgment (doc. 39), at 12; United Cherokee Ani-Yun-Wiya Nation Enrollment Card (doc. 40-7).

> Q.  Do you have any documented proof that you are a descendant of
> Cherokee Indians?
> A.  At this point in time I do not.
> Q.  Have you ever seen any information other than what might be in
> some history book that would show you when your mother's family

intersected with non-Native Americans?

A.  At this point in time, I have no such documents.

Q.  So the only evidence that you have that you are a Native
American is what your mother told you when you were six years old?

A.  That is correct at this point.

Bradford Dep., at 40.

Bradford testified that he first learned that he was a Native American from his mother when he was six years old.  Bradford Dep., at 37.  Before starting the first grade, his mother told him that his Native American ancestry "was to never be discussed" because she was concerned about racism targeted against her family. Bradford Dep., at 37.  Bradford claims that his mother's family "[is] supposed to be of Cherokee descent and the Teagues had intermarried with others in the area and there was some conjecture also about the – or theorizing about the Clantons as well, that they had intermarried too."  Bradford Dep., at 39.  He explains that his mother's maiden name is Teague,[7] and his maternal grandmother was a Clanton. Bradford Dep., at 39.  Bradford also knew of one relative, Clarence Teague, who "had heard some of the same things but he couldn't say . . . with absolute 100 percent certainty, hey, here are the documents."  Bradford Dep., at 41.

Bradford's father was "very dark-skinned" and "looked like somebody from

_____

[7]Plaintiff later notes that his mother's family is also part Irish.  Bradford Dep., at 46.

9

India, Pakistan." His ancestors purportedly came from Rio De Janeiro, Brazil, and when they arrived "in this country they spoke Portuguese and were supposed to have been people of Indian ancestry or mixed with Indians in Brazil or the country of Brazil." Bradford Dep., at 43. Bradford also testified that his paternal grandmother was from Italy. Bradford Dep., at 47.

Prior to becoming a member of a Native American tribe in May 2010, Bradford submitted to the court three affidavits and a photograph to establish his ancestry. John Ingram was a coworker of Bradford's from 1987-1989, during which time Bradford told him and other coworkers that he was a Native American. Ingram Aff., ¶¶ 5-7, Ex. G to City's Motion for Summary Judgment (doc. 29-8). Another individual, Hugh Glaze, worked with Bradford in 1989. Glaze recalled asking Bradford if he was Native American, to which Bradford responded affirmatively. Hugh N. Glaze Aff., ¶¶ 2, 4-5, Ex. H to City's Motion for Summary Judgment (doc. 29-9). James Teague, Bradford's cousin, stated that their great grandmother was a full-blooded Native American. Teague Aff., ¶¶ 2, 4, Ex. I to City's Motion for Summary Judgment (doc. 29-10). Finally, Bradford submitted a black-and-white photograph of six unidentified individuals. He asserts that the picture depicts his great grandmother, a purported Native American. Ex. J, to

City's Motion for Summary Judgment (doc. 29-11).[8]

## **Legal Standard**

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law.  *See* FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The facts, and any reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970).  A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Eberhardt v.*

---

[8]Plaintiff also testified that a DNA test identified him as a Native American. When he telephoned the testing company asking if the DNA results could be used in court, the company told him they could not be, explaining that the test was not scientifically reliable.  Bradford Dep., at 174.

*Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).  In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or merely be colorable.  *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986).  Speculation does not create a genuine issue of fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence.  *Frederick v. Spring/United Management Co.* 246 F.3d 1305, 1311 (11th Cir. 2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## Analysis

For the reasons stated below, the court finds that both the City and the Board's motions for summary judgment are due to be GRANTED, and all claims against the City and Board are due to be DISMISSED.

ALA. Code § 25-1-10

Standing is a threshold jurisdictional issue that must be addressed before and independently from the merits of a party's claims.  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (citations omitted).  A plaintiff must have

standing at "the time at which the plaintiff's complaint is filed." *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1275 (11th Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180, 120 S.Ct. 693, 704 (2000) ("[W]e have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation."); *Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 524 (6th Cir.2001) ("[Standing] is to be determined as of the time the complaint is filed."); *Becker v. Fed. Election Comm'n,* 230 F.3d 381, 386 n. 3 (1st Cir.2000) (noting that *Lujan* "clearly indicat[es] that standing is to be 'assessed under the facts existing when the complaint is filed' "); *White v. Lee,* 227 F.3d 1214, 1243 (9th Cir.2000) ("Standing is examined at 'the commencement of the litigation.' "); *Park v. Forest Serv. of the United States,* 205 F.3d 1034, 1037 (8th Cir.2000) ("We do not think, however, that the actual use of checkpoints in 1997, 1998, and 1999 is relevant on the issue of standing because all of these events occurred after [the plaintiff] filed her original complaint."); *Perry v. Vill. of Arlington Heights,* 186 F.3d 826, 830 (7th Cir.1999) ("Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit.") (some citations omitted or modified)).

The constitutional requirements for standing require that a plaintiff be

13

injured by some conduct of the defendants. *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 1163 (1997) (listing the elements of standing as a concrete, particularized injury that was actual and imminent; a causal connection between the injury and the conduct complained of; and the injury must be redressable by favorable court action).  In this case, Bradford alleges that he is harmed by the defendants' failure to include Native Americans in their affirmative action policies pursuant to ALA. Code § 25-1-10.  Although the legislature "may enact statutes creating legal rights, the invasion of which creates standing," *see U.S. v. Weiss*, 467 F.3d 1300, 1311 (11th Cir. 2008) *(*citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3, 93 S.Ct. 1146 (1973)), it follows that the legislature also creates the contours of the legal right.  The Alabama statute requires employers to include in their affirmative action policies Native Americans who can prove their heritage by "birth certificate, by tribal records, or by other reliable records."  ALA. Code § 25-1-10.

Bradford was outside of this class of individuals when he filed his complaint on April 17, 2009; Bradford did not join this class of individuals until May 17, 2010, more than a year after his lawsuit was filed, when he joined the United Cherokee Ani-Yun-Wiya Nation.  Thus, Bradford had suffered no injury at the time he filed suit and accordingly lacks standing to bring a claim against the

14

Board or City.

Assuming *arguendo* that Bradford has standing and ALA. Code § 25-1-10 authorizes a private right of action, ALA. Code § 25-1-10 requires only *employers* to include Native Americans in their affirmative action programs.  Bradford testified that he is employed by the City as an employee of the Fire and Rescue Service and has never been employed by the Board.  Bradford Dep., at 11, 102.  The position for which he was applying, Fire Prevention Inspector I, was also a position with the City, not the Board.  Bradford Dep., at 20. Finally, there is no genuine issue of material fact as to whether the Board has "control or custody of any employment, place of employment or of any employee" pursuant to ALA. Code  § 25-1-1(c)(1) so as to render Bradford an employee of the Board.[9]  For this

---

[9]The definition of employer includes a person "having control or custody of any employment. . . ."  ALA. Code  § 25-1-1(c)(1).  The authority and scope of the Board's power is set out in the Rules and Regulations of the Personnel Board of Jefferson County ("Board Rules").  When an appointing authority, like the City, wishes to fill a vacant position, it informs the Board of such.  Board Rule 11.1.  The Board tests applicants on "the basis of merit, efficiency, and relative fitness" through "competitive examinations."  Board Rule 9.7.  It grades the applicants' performance on the exam, ranks qualified applicants, and certifies a list of applicants as eligible and qualified for vacant positions.  Board Rules 9.8, 10.1, 10.4, 11.2.  In this case, the Board did no more than its prescribed functions: it tested Bradford, graded his score and ranked him seventh, and certified that he was an eligible applicant.  These functions do not demonstrate such control or custody of employment so as to render the Jefferson County Personnel Board an employer of all of the civil service employees in the more than twenty jurisdictions for which the Board operates in this manner.

additional reason, there is no genuine issue of material fact regarding Bradford's

ALA. Code § 25-1-10 claim against the Board.

42 U.S.C. § 1981

Claims brought under 42 U.S.C. § 1981 "are subject to the same standards

of proof and employ the same analytical framework" as Title VII claims.  *Bryant v.*

*Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  To prove a claim of race

discrimination through circumstantial evidence, *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) lays out a burden-shifting framework.

The analysis requires that the plaintiff first must establish a prima facie case of

discrimination by showing that: (1) he is a member of a protected class; (2) he

applied for and was qualified for the position; (3) he was rejected; and (4) the

defendant hired someone outside the protected class to fill the position.  *Walker v.*

*Prudential Prop. And Cas. Ins. Co.*, 286 F.3d 1270, 1274-75 (11th Cir. 2002).

When the plaintiff establishes a prima facie case of discrimination, the

burden shifts to the defendant to articulate a legitimate, non-discriminatory reason

for the challenged employment decision.  *Reeves v. Sanderson Plumbing Products,*

---

Moreover, the court notes that in making its argument to the court, the
plaintiff cites and attempts to incorporate by reference the deposition of Lorren
Oliver, a document that was never submitted to this court.

*Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000).  If the defendant articulates one or more legitimate, non-discriminatory reasons, the presumption of discrimination created by the plaintiff's prima facie case disappears.  *Id.* at 142-43.  The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but instead were a pretext for discrimination.  *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Assuming *arguendo* that Bradford can present a prima facie case, neither the Board nor City acted in a manner that violated § 1981.  In the light most favorable to Bradford, the record shows that the Board created a list of certified eligibles, in which Bradford was included, by giving and scoring an examination that all applicants were required to take.  The City has presented evidence that it selected Washington for the position because, according to the unanimous decision of the three-person interview panel, she was the most qualified.  None of Cunningham, Brooks, or Chief Harper had any knowledge of plaintiff's race.  At this stage, the defendants need only produce evidence sufficient for the trier of fact to conclude that the defendants acted for legitimate, non-discriminatory reasons,

17

*Reeves*, 530 U.S. at 142, and the defendants have met this light burden.

Once the defendant produces a legitimate, non-discriminatory reason for its actions, the plaintiff must prove that the defendant's proffered reason is pretext for illegal discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 2752,(1993).  The plaintiff may prove pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095 (1981) (citing *McConnell Douglas*, 411 U.S. at 804-05).

Bradford asserts several arguments that the Board's proffered explanations for its decisions are unworthy of credence, but the simple fact of the matter is that the Board only administers an examination to the applicants and creates a list that includes the most qualified applicants.  There is no evidence that the Board uses anything other than the examination scores to create the certified list of eligibles. There is no evidence that the examination was given in a discriminatory manner, or that any examination scores were altered according to one's race; in fact, the evidence demonstrates that the Board based the certified list of eligibles based on the legitimate results of the examination.   After the Board gives the list of

certified eligibles to the City, the Board's role is at an end.[10]  Because the evidence

demonstrates that the Board administered a legitimate, non-discriminatory test, the

Board graded the examination in a non-discriminatory manner, and the Board

created the list of eligibles based on the legitimate scores of the examination, the

plaintiff has failed to demonstrate the Board's actions were a pretext for race-

based discrimination.

    The plaintiff also argues that because the Board was bound to the 1981

consent decree issued to correct discrimination wrought by the City and Board, a

discriminatory atmosphere sufficient to infer the Board discriminated against

Bradford exists.  Such an argument is untenable.  The consent decree admonished

discriminatory screening performed by the Board in the past, *see Ensley Branch,*

*N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1571-1574 (11th Cir. 1994), but the position

of Fire Prevention Inspector I was *never* subject to the consent decree.  Oliver Aff.

¶¶ 6-7. The plaintiff, in its response to the Board's motion to strike, refers the

---

[10]Bradford argues that the Board's failure to take his experience into account when making the list of eligibles is evidence of pretext because the Board is charged with creating a list of qualified, eligible applicants.  However, no evidence has been presented to suggest that anything but legitimate examination scores were used to determine the rankings of the applicants on the certified list of eligibles.  There is no evidence that the Board gives the examination to only certain applicants based on their race or it considered the experience of some applicants based on their race.  Accordingly, there is no evidence that the process used by the Board showed any race-based discrimination.

court *Denney v. City of Albany*, 247 F.3d 1172, 1189-90 (11th Cir. 2001), the only Eleventh Circuit authority he relies upon in arguing that the Board is nevertheless liable.

However, in *Denney*, the Eleventh Circuit upheld the grant of summary judgment for the defendant where a prior case establishing discrimination by a defendant involved "different applicants and a different selection process," which weighed in favor of summary judgment, and involved "the same actor making the same kind of personnel decision," which weighed against granting summary judgment. *Id.* at 1189. In this case, the applicants are undoubtedly different and the selection process, which previously included gender and race quotas, *see Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1556-57 (11th Cir. 1994) and included 37 positions but not the Fire Prevention Inspector position, *see* Oliver Aff. ¶ 6, is different. Moreover, since the beginning of the consent decree approximately twenty-nine years ago, there have been multiple actors serving as a decision maker or director of the Board. Thus, there are not sufficient similarities between the discrimination occurring throughout the lifetime of the consent decree and the current non-selection of Bradford to create a genuine issue of whether a discriminatory atmosphere exists.

As for the § 1981 claim against the City, Bradford fails to "show that the

20

disparities between the successful applicant's and [his] own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *cert. denied*, 546 U.S. 960, 126 S.Ct. 478).   Bradford insists that his training as a firefighter and his certifications made him so qualified that they should have propelled him ahead of Washington in the rankings, and he should have been chosen for the position. However, while Bradford received a rating of "exceeds job requirements" for education and training, as did Washington, his ratings in the other six fields paled in comparison to Washington's.

The three-person interview committee unanimously chose Washington for the position, as she received five ratings of "exceeds job requirements," one of which was in education and training as she has completed substantial course work toward a master's degree, and two ratings of "meets job requirements."  Bradford received two "exceeds job requirements," three "meets job requirements," and two "does not meet job requirements."  Although Bradford had been a fire fighter, previous experience in fire fighting was not required, and no fire safety and inspection experience was required because the position was entry-level.  At least

two of the members of the interview committee believed Washington was a better

communicator than Bradford and performed better during the interview, and stated

that the interview was the most important part of the hiring process.  It is by now

axiomatic that courts are "not to act as a super personnel department that second-

guess[] employers' business judgments."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d

1079, 1092 (11th Cir. 2004).  In this case, it cannot be said that Bradford's

qualifications were such that no reasonable person could have selected another

applicant.[11]

## 42 U.S.C. § 1981 Claim of Contractual Interference

To the extent Bradford argues that the Board's alleged discrimination

interfered with a contract or potential contract, the court finds there is no genuine

---

[11]The plaintiff argues that a discriminatory atmosphere exists at the
Birmingham Fire and Rescue Service based on the affidavit testimony of Rodney
Dodson, which stated that Chief Charles Gordon and Glendon Colvin told Dodson
that he was the best applicant for a position, but eight African-Americans were
promoted instead of him.  He also testified that at least two of those who were
promoted did not have "as many" qualifications as he had.  Dodson Aff., ¶¶ 3-7,
Ex. 17 to Plaintiff's Response to City's Motion for Summary Judgment (doc. 40-
17).  However, as discussed above, past instances of discrimination by a different
interview panel and different fire chief for a different position are not probative of
discrimination.  *Denney*, 247 F.3d at 1189. Moreover, *Denney*, the only Eleventh
Circuit authority cited by the plaintiff, considered only the probative value of past
findings of discrimination as determined by a federal court, not the value of an
affidavit.

issue of material fact that would allow this claim to go to a jury.  Federal law bars

racial discrimination in the making of private as well as public contracts through

42 U.S.C. § 1981.  *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 107

S.Ct. 2022, 2026 (1987) (citation omitted).  "Section 1981 offers relief when racial

discrimination blocks to creation of a contractual relationship, as well as when

racial discrimination impairs an existing contractual relationship, so long as the

plaintiff has or would have rights under the existing or proposed contractual

relationship."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct.

1246, 1250 (2006).  Thus, a § 1981 claimant "must initially identify an impaired

contractual relationship" under which the plaintiff has rights."  *Id.* (citation

omitted).

> The plaintiff argues in one paragraph that a contract exists:

> The plaintiff offered himself to the Personnel Board as a candidate for
> the Fire Inspection I position.  In return for offering to aid the
> Personnel Board in its purpose of assisting "jurisdictions in providing
> a qualified talent pool to deliver services to the Jefferson County
> residents . . ." ([Oliver Dep.] at 24-25),[12] the Plaintiff expected that he
> would be fairly evaluated for the position.  As such, any action by the
> Personnel Board which impaired the Plaintiff's attempt to contract
> with the City of Birmingham for the Fire Prevention Inspector I
> position satisfies the first prong of the *Domino's Pizza, Inc. v.*

---

[12]As noted previously, the deposition of Lorren Oliver was never submitted
to the court.

*McDonald* test.

Plaintiff's Opposition to Defendant Board's Motion for Summary Judgment, at 10 (doc. 41) (footnote added).

This argument is so deficient in demonstrating the existence of a contract that it is difficult to explain why.  A valid contract requires an offer and acceptance, consideration, and mutual assent to the essential terms of the contract. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 673 (Ala. 2001) (citing *Hargrove v. Tree of Life Christian Day Care Ctr.*, 699 So.2d 1242, 1247 (Ala. 1997)).  "It has long been the law in Alabama (and it is elementary) that the mutual assent of the parties to the same thing, and in the same sense, is an essential element to every contract."  *Board of Comm'rs of Alabama State Bar v. Jones*, 281 So.2d 267, 273 (1973).  The plaintiff presented no evidence that each party contemplated the type of contract described, and this court does not believe that every applicant for a position in the civil service of the more than twenty jurisdictions that use the Board to test applicants intends to assent to a contract with the Board, agreeing to exchange "aid [to] the Board" for applying for employment in return for fair evaluation.  No contract between the Board and plaintiff exist, and thus plaintiff's § 1981 claim fails.

24

Civil Conspiracy

"[A] conspiracy itself furnishes no cause of action.  The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed." *Allied Supply Co., Inc. v. Brown*, 585 So.2d 33, 36 (Ala. 1991) (citing *Massengill v. Malone Freight Lines, Inc.*, 538 So.2d 784 (Ala. 1988); *Sadie v. Martin*, 468 So.2d 162 (Ala. 1985)); *see Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala. 1988) ("Civil conspiracy is a combination of two or more persons to accomplish an unlawful end (by civil standards) or to accomplish a lawful end by unlawful means.") (citation omitted).

In this case, there is no underlying wrong.  As discussed above, all of Bradford's claims against the Board are due to be dismissed and therefore cannot constitute an underlying wrong *See Allied Supply Co., Inc.*, 585 So.2d at 36 ("If the underlying cause of action is not viable, the conspiracy claim must also fail.") (citing *Massengill v. Malone Freight Lines, Inc.*, 538 So.2d 784 (Ala. 1988); *Sadie v. Martin*, 468 So.2d 162 (Ala. 1985)).  Accordingly, no reasonable jury could find a genuine issue of material fact as to Bradford's civil conspiracy claim.

## **CONCLUSION**

For the reasons discussed herein, it is hereby **ORDERED** that Defendant

25

City of Birmingham's motion for summary judgment is **GRANTED** and Defendant Personnel Board of Jefferson County's motion for summary judgment is **GRANTED**, and all plaintiff's claims against said defendants shall be **DISMISSED** with prejudice by separate order.

The court having considered Defendant Jefferson County Personnel Board and Defendant City of Birmingham's motions to strike (docs. 53 and 56), and having granted said defendants' motions for summary judgment, and being of the opinion that the materials identified in said motions to strike are immaterial to the resolution of this case, the court finds said motions to strike **MOOT**.

The court shall so rule by separate order.

**DONE** and **ORDERED**, this the 15th of June 2010.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE